LOUIS J. and PATRICIA A. MICHOT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Michot v. Commissioner
Docket Nos. 10474-79, 2257-80.
United States Tax Court
T.C. Memo 1982-128; 1982 Tax Ct. Memo LEXIS 620; 43 T.C.M. (CCH) 792; T.C.M. (RIA) 82128; March 16, 1982. F. Kelleher Riess,William T. Steen, and James Parkerson Roy, for the petitioners in docket No. 10474-79. F. Kelleher Riess, for the petitioners *621 in docket No. 2257-80. Deborah R. Jaffe, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Year
Deficiency
1974
$ 40,511
1975
21,361
1976
3,582
1977
9,837
The issue for decision is whether amounts received by petitioner Louis J. Michot upon termination of franchising agreements are taxable as ordinary income or as capital gain. These cases have been consolidated for trial, briefing, and opinion. FINDINGS OF FACT Some facts have been stipulated and are found accordingly. Petitioners, Louis J. and Patricia A. Michot, were residents of Lafayette, La., when they filed their petitions herein. During 1958, Louis J. Michot (petitioner) was working in Washington, D.C., but wanted to return to Louisiana where he had lived previously. With that desire in mind, he contacted Burger Chef Systems, Inc. (Burger Chef) to acquire the right to develop Burger Chef franchises in Louisiana. At that time, Burger Chef was a young, family-owned business operating one store in Indianapolis, Ind.
On October 15, 1958, petitioner *622 and Burger Chef entered into a Territory Franchise Agreement. Under that agreement, petitioner became the exclusive franchising agent for Burger Chef in Louisiana and, as such, gained the right to franchise the Burger Chef name and to sell Burger Chef franchises, equipment, and products to franchisees. Petitioner paid Burger Chef $ 13,000 for such rights. [1]
Petitioner promised to franchise 10 equipped stores within 5 years, to execute all franchises on Burger Chef's forms with Burger Chef's approval, to inspect each franchised store at least twice a month, to complete and forward all forms required by Burger Chef, and to operate certain opened but unfranchised stores. For his efforts, petitioner was entitled to a set commission whenever a store opened. Petitioner was also entitled to 50 percent of the royalties Burger Chef received from the operation of the store. [2]
*623 The agreement provided that [n]othing herein contained shall be construed to vest in Licensee [petitioner] any right, title, or interest in and to the tradename, trademarks, goodwill, building signs and/or blueprints * * * other than the right and license to use said * * * pursuant to the terms and conditions during the effective term of the franchise and license granted hereunder. On January 22, 1962, petitioner and Burger Chef entered into another Territory Franchise Agreement. Under that agreement, petitioner became the exclusive franchising agent for Burger Chef in Mississippi. The Mississippi agreement is substantially similar to the Louisiana agreement in all respects material herein, except petitioner paid Burger Chef $ 3,250 for his rights in Mississippi and promised to franchise 11 equipped Burger Chef stores within 5 years. Sales of franchises under the agreements were handled on a "turn key" basis--the franchisee bought a franchise for a ready to operate store. Initially, petitioner sold franchises to unrelated third parties. However, as the sale of franchises became increasingly difficult, petitioner adopted a policy of selling to himself. In other words, *624 petitioner or an entity owned or controlled by him acted as franchisee-operator. By 1973, over 80 percent of the Burger Chef stores in Louisiana and Mississippi came under that dual system whereby petitioner was essentially both franchisor and franchisee. [3]
Petitioner was involved from the ground up in the development of Burger Chef in his two-state area. He conducted market studies, chose sites, arranged land leases or purchases, supervised construction, arranged equipment installation, hired and trained employees, made periodic inspections, and provided general supervisory support. [4] While certain of petitioner's activities are directly traceable to his obligations as a franchisor for Burger Chef, most served both to fulfill his duty as franchisor and to aide his investment as a franchisee. Petitioner received substantial income as a franchisor for Burger Chef. Between 1961 and 1973 he received *625 an average of $ 17,368.73 in commissions each year and an average of $ 58,368.14 in royalties each year. In 1968, General Foods acquired Burger Chef, and petitioner's relationship with Burger Chef deteriorated. On May 21, 1973, Burger Chef took two actions: (1) it notified petitioner by letters that the agreements covering Louisiana and Mississippi would be terminated as of August 21, 1973, and (2) it filed declaratory judgment actions in Federal district courts in Louisiana and Mississippi seeking a declaration that either the agreements between it and petitioner were terminable upon reasonable notice or that petitioner had defaulted so as to justify termination of the agreements. By answer, petitioner denied the agreements were terminable upon reasonable notice, denied any default, and counterclaimed for injunctive relief and damages. The Federal district courts issued injunctions preventing Burger Chef from terminating the agreements pending the outcome of litigation. Trial on the merits commenced in the Federal District *626 Court for the Eastern District of Louisiana. However, before the conclusion of that trial, a settlement was reached. Under the settlement agreement, petitioner agreed to termination of the Louisiana and Mississippi agreements as of August 21, 1973, and waived any claim to certain disputed commissions. In return, petitioner received (1) a $ 300,000 reduction in royalties to be paid to Burger Chef over a 5-year period from stores operated by petitioner as a franchisee, (2) $ 250,000 in credits on future equipment purchases, and (3) the right to buy one new Burger Chef franchise in either Louisiana or Mississippi for $ 1.00. The last right was valued at $ 25,000; thus, petitioner was entitled to a total of $ 575,000 under the settlement agreement. [5]
Petitioner treated $ 56,405 of the $ 575,000 settlement amount as interest. The remainder, $ 518,595, was received by petitioner as follows: [6]
*627 1974
$ 121,407
1975
75,317
1976
115,214
1977
125,856
Post 1977
Remainder
The settlement agreement only effected the termination of the agreements entitling petitioner to act as Burger Chef franchisor in Louisiana and Mississippi; it did not terminate petitioner's status as a Burger Chef franchisee. On their Federal income tax returns for 1974 through 1977, petitioners reported the settlement proceeds as long-term capital gain from the sale of the franchise agreements and elected the section 453 [7] installment method. [8] In his statutory notices of deficiency, respondent determined that the settlement proceeds received in each year were ordinary income. OPINION At issue is whether the settlement proceeds *628 received by petitioner upon termination of his franchising agreements with Burger Chef are long-term capital gain or ordinary income.
Capital gain is the gain derived from the sale or exchange of a capital asset. Sec. 1222(1) and (3). [9] The parties agree the termination of the franchising agreements was a sale or exchange. Thus, their disagreement centers on whether those franchising agreements were capital assets. A capital asset is defined as "property held by the taxpayer" which does not fall within any of six enumerated categories. Sec. 1221. The parties agree the franchising agreements, if property, are not within any of those six categories. Petitioner maintains the franchising agreements were property, and, thus, he reasons they were capital assets. Respondent contends the franchising agreements represent contract rights which do not rise to the level *629 of property within the meaning of section 1221. Additionally, respondent argues the settlement proceeds are merely a substitute for future ordinary income and cannot be characterized as capital gain. While syntactically logical, petitioner's argument that the agreements are capital assets simply because they are property and do not fall within any of section 1221's enumerated exceptions is not legally sound. See Commissioner v. Gillette Motor Co.,364 U.S. 130 (1960); Vaaler v. United States,454 F.2d 1120 (8th Cir. 1972); Bellamy v. Commissioner,43 T.C. 487 (1965). Focusing on the spirit, rather than the letter, of the statutory capital gains provisions, the courts have developed three theories to exclude items commonly denominated as property from section 1221 capital asset status. First, some cases derive from Gillette Motor Co.,supra, the rule that all that is property in a common sense is not property within the meaning of section 1221. See, e.g., Commissioner v. Ferrer,304 F.2d 125 (2d Cir. 1962), modifying 35 T.C. 617 (1961); Regenstein v. Commissioner,35 T.C. 183 (1960). *630 Second, other cases, relying on Commissioner v. P.G. Lake, Inc.,356 U.S. 260 (1958); and Hort v. Commissioner,313 U.S. 28 (1941), deny capital asset status when a substitute for future ordinary income is perceived. See, e.g., Bisbee-Baldwin Corporation v. Tomlinson,320 F.2d 929 (5th Cir. 1963); Wiseman v. Halliburton Oil Well Cementing Company,301 F.2d 654 (10th Cir. 1962); Brown v. Commissioner,40 T.C. 861 (1963). Third, still other cases apply the doctrine of Corn Products Co. v. Commissioner,350 U.S. 46 (1955), to deny capital asset status to property serving an integral function in the holder's everyday business. See, e.g., Hallcraft Homes, Inc. v. Commissioner,40 T.C. 199 (1963). While the use of those three theories has produced a line of cases which seem inherently inconsistent at times, [10] a common theory underlies each in that what is being sought is a separation of value appreciation entitled to capital gain treatment from any regular ordinary income element. As we said in Estate of Shea v. Commissioner,57 T.C. 15, 25 (1971): *631 [T]he difference between the amount paid * * * and the amount received upon its [the contract's] disposition represented appreciation in value over time, due purely to the action of market forces. This is precisely the type of profit for which capital gain treatment is intended. As a practical matter, the sale of intangible property, whether it be a patent, a copyright, a franchise, a license, a delivery route, or a ship charter, carries with it the right to earn future income. It is this right which gives value to the property. It does not follow, however, that the sale of property results in the realization of ordinary income. Thus, the true inquiry is whether the gain realized is attributable to an appreciation *632 in value over time, usually caused by market forces. If so, capital gain treatment is proper. Viewed in that light, the parent contract right cases of Commissioner v. Gillette Motor Co.,supra;Commissioner v. P.G. Lake, Inc.,supra; and Hort v. Commissioner,supra, are easily understood. In each, the seller-taxpayer sold an income stream, but retained the basic asset. Therefore, it is easily seen that all value appreciation was retained and a mere ordinary income right was transferred. Making a distinction between value appreciation deserving of capital gain and anything else is not always so easy and, at times, approaches impossibility. Nevertheless, the courts have made a valiant effort, illustrated best by those cases requiring allocation between seemingly indivisible elements. See, e.g., Commissioner v. Ferrer,supra;Bisbee-Baldwin Corporation v. Tomlinson,supra.
In determining to what a taxpayer's gain is attributable, the crucial matter is what he gave up, not what *633 he received. Kingsbury v. Commissioner,65 T.C. 1068 (1976); Commercial Solvents Corporation v. United States,192 Ct. Cl. 339, 427 F.2d 749 (1970). In the case before us, petitioner gave up four distinct and valuable rights when he surrendered his franchising agreements with Burger Chef: (1) his right to prevent franchisees, other than Burger Chef itself, from operating in his area; (2) his claim to certain disputed, but already earned, commissions; (3) his right to commissions when any stores opened in the future; and (4) his right to continuing royalty interests in operating stores. Only two of those four enumerated rights clearly fall on one side or the other of the capital gain-ordinary income line. The portion of petitioner's gain attributable to his release of any claim to already earned commissions is pure ordinary income which simply cannot be transformed into capital gain. Equally clear is that petitioner's release of his negative power to prevent others from becoming Burger Chef franchisees in his territories gives rise to capital gain. See Commissioner v. Ferrer,304 F.2d 125, 133 (2d Cir. 1962), modifying as to *634 other parts 35 T.C. 617 (1961); Anderson v. United States,468 F. Supp. 1085 (D. Minn. 1979). See also United States v. Dresser Industries, Inc.,324 F.2d 56 (5th Cir. 1963). Any gain inherent in petitioner's negative power stems from market forces rather than from any personal service or other traditional ordinary income base. The remaining two rights, future commissions and future royalties, are not disposed of so easily. [11] However, we conclude the right to future commissions gives rise to ordinary income, while the right to future royalties gives rise to capital gain. As to the commissions, their value arises from petitioner's services and is only slightly dependent upon market forces. Under his agreements with Burger Chef, petitioner was entitled to a commission when a new store began operation. The amount of the commission was set; it did not vary depending on the size of the store. In surrendering that right, petitioner gave up an income stream dependent on his personal services. As such, that right gives rise to ordinary income. See Bisbee-Baldwin Corporation v. Tomlinson,320 F.2d 929 (5th Cir. 1963). *635 However, a different result obtains with respect to petitioner's right to future royalties. While the agreements tied those royalties to petitioner's duty to inspect and to report on operating stores, see note 2, supra, we are convinced they did not represent compensation for personal services. Petitioner paid $ 16,250 for his interests in Burger Chef in Louisiana and Mississippi, and, in effect, acquired an interest in the operating stores analogous to a leasehold or a partnership interest. See Commissioner v. Ferrer,304 F.2d 125 (2d Cir. 1962), affg. on that point 35 T.C. 617 (1961). After a store opened, petitioner's duties as franchisor were minimal. Thus, the principal value of the royalties arose from appreciation due to market forces rather than from petitioner's services. As we noted in King Broadcasting Co. v. Commissioner,48 T.C. 542, 550 n. 1 (1967), *636 a franchise right (analogous to petitioner's royalty right herein) "give[s] its holders some kind of enforceable estate in the * * * system and in the substantial goodwill that had been built * * *." See also 48 T.C. 542 at 551. [12]
Having characterized petitioner's transferred rights, we must determine what part of the $ 575,000 is allocable to each--a difficult task at best. Clearly, the capital gain elements--petitioner's power to exclude others and his continuing royalty interest--were the most valuable of the four rights he surrendered. On the other hand given the fact that any earned commissions were disputed and future commissions were unlikely to be large in amount, [13] we conclude both commissions rights were of little value. Based on an evaluation of the record as a whole, including past amounts paid attributable to petitioner's different rights, and our findings above, we conclude that of the $ 575,000 settlement proceeds, 70 percent is attributable to petitioner's royalty right and right of exclusivity and is capital *637 gain, while 30 percent is attributable to petitioner's commissions rights and is ordinary income. To reflect concessions and the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. The original Louisiana agreement called for petitioner to pay $ 30,000 for his rights; however, a June 1960 agreement, backdated to October 15, 1958, reduced that amount to $ 13,000.↩
2. As the agreement was worded, petitioner's 50 percent royalty interest was for his continuing supervision of franchised stores.↩
3. As of May 21, 1973, there were 35 Burger Chef stores in Louisiana--27 of which were owned by petitioner or entities he owned or controlled. At the same time, there were 13 Burger Chef stores in Mississippi--12 of which were owned by petitioner or entities he owned or controlled.↩
4. Sometime between 1958 and 1973, petitioner and family members formed Louis J. Michot and Associates, Inc., to manage the Burger Chef business.↩
5. Originally, petitioner wanted a $ 1,000,000 settlement based on his estimation that over the ensuing 10 years he would probably be entitled to about $ 100,000 per year under the Louisiana and Mississippi agreements.↩
6. The record does not reveal how amounts were "received" by petitioner. However, we note that the settlement agreement granted petitioner the option to receive $ 100,000 in cash in lieu of an equal dollar amount of any of the settlement proceeds categories.↩
7. Unless otherwise provided, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. ↩
8. Although petitioner paid $ 16,250 for the franchise agreements and capitalized such amount on his books and records, petitioners claimed a zero basis in those agreements. Thus, all proceeds received were reported as income since the entire "contract price" was "gross profit." See sec. 453(a).↩
9. Sec. 1222(3)↩ relating to long-term capital gain is applicable herein since petitioner held the agreements more than one year.
10. Compare General Guaranty Mortgage Co. v. Tomlinson,335 F.2d 518 (5th Cir. 1964), and Bisbee-Baldwin Corporation v. Tomlinson,320 F.2d 929 (5th Cir. 1963), with United States v. Dresser Industries, Inc.,324 F.2d 56 (5th Cir. 1963). Also compare Commissioner v. Ferrer,304 F.2d 125 (2d Cir. 1962) with Ayrton Metal Company v. Commissioner,299 F.2d 741↩ (2d Cir. 1962).
11. See Eustice, Contract Rights, Capital Gain, and Assignment of Income-The Ferrer Case,20 Tax L. Rev. 1 (1964); Chirelstein, Capital Gain and the Sale of a Business Opportunity: The Income Tax Treatment of Contract Termination Payments,49 Minn. L. Rev. 1↩ (1964).
12. We again note respondent concedes the termination of petitioner's agreements with Burger Chef constitutes a sale or exchange.↩
13. Evidence presented at trial convinces us that, when the agreements were terminated, future Burger Chef expansion in Louisiana and Mississippi looked dismal.↩