JAMES E. FOY AND NANCY L. FOY, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

EXPANSION ENTERPRISES, INC., PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 10976–81, 10977–81.    Filed January 14, 1985.

*Clifford N. Ribner,* for the petitioners.
*Juandell D. Glass,* for the respondent.

SWIFT, *Judge*: Respondent determined deficiencies in petitioners James and Nancy Foy's Federal income tax liabilities for the years 1976 and 1977, in the amounts of $2,095 and $3,683, respectively, and in petitioner Expansion Enterprises' Federal income tax liabilities for the years 1975 and 1976, in the amounts of $12,288.29 and $70,822.74, respectively. Respondent also included in the notice of deficiency to petitioner Expansion Enterprises for the year 1975, an addition to tax pursuant to section 6651(a)(1)[1] in the amount of $3,072.07.

The parties have reached a partial settlement, and the three remaining issues for the Court to decide are: (1) Whether proceeds received by petitioners from the sale of certain contract rights are taxable as ordinary income or as capital gain; (2) whether the proceeds are reportable under the installment method; and (3) whether petitioner Expansion Enterprises is subject to an addition to tax under section 6651(a)(1). An order consolidating these cases was issued by the Court on December 6, 1982. These consolidated cases were submitted fully stipulated pursuant to Rule 122. The stipulated facts are incorporated herein by this reference.

---

[1]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Petitioners James and Nancy Foy resided in Coweta, Oklahoma, at the time their petition herein was filed. They timely filed their 1976 and 1977 Federal income tax returns.

Petitioner Expansion Enterprises, Inc., a California corporation, maintained its principal place of business in Tulsa, Oklahoma, at the time its petition herein was filed. Expansion Enterprises filed its Federal corporate income tax return for its taxable year ending September 30, 1975, on or about July 13, 1976, and timely filed its Federal corporate income tax return for its taxable year ending September 30, 1976.

The issues herein arise out of the growth and development of a janitorial and building maintenance business which began in the 1960's in Southern California and which expanded throughout the United States in the early 1970's. Most of the business expansion and growth occurred in the form of franchises, and the primary issue herein concerns the rights, responsibilities, and interests of petitioners in the franchise network and the manner by which they should be taxed on their transfer in 1976 of their contract rights in the franchise network.

Specific information with regard to the financial success or failure of the various Environment Control franchises, their share of the local janitorial market in the various cities, the quality of their management, and the extent of the goodwill that may have been developed by the franchisors or by the franchisees is not in the record. The necessary facts, however, which are critical to a determination of the taxation of petitioners on the sale of their interests in the franchise network are found in the record and for the most part are reflected in a series of contractual agreements entered into between 1969 and 1976, which agreements established the rights and responsibilities with respect to the franchise network of petitioner James Foy (hereinafter referred to as Foy), of an individual named Daryl Kraft (hereinafter referred to as Kraft), of petitioner Expansion Enterprises (Foy's wholly owned corporation), and of Environment Control Building Maintenance Co. (Kraft's wholly owned corporation).

We will begin our discussion of the facts with a brief description of the background of the janitorial business and of the early business relationship between the founding individu-

als. Unfortunately, the written agreements between the individuals were poorly drafted, and the stipulated facts leave many aspects of the business unclear.

Foy attended Biola College in Los Angeles, California. After graduation in the late 1950's or early 1960's, he spent 4 years as a youth pastor in Santa Ana, California. Foy then began selling insurance and continued to do so exclusively for approximately 4 years. One of his insurance clients was Kraft.

Kraft also attended Biola College and became friends with Foy. During Kraft's college days at Biola and after graduating, he worked for a company that provided janitorial and building maintenance services in Southern California. He eventually became one of the company's three partners.

Some time around 1963, Kraft formed three partnerships to provide janitorial services for commercial businesses. The partnerships formed by Kraft operated under the name of ADA Building Maintenance Co. One of the partnerships was formed with Ken McCray (hereinafter referred to as McCray) to provide janitorial services in Fresno, California. Another partnership was formed with John Theissen to provide janitorial services in Los Angeles, California. A third partnership was formed with Jerry Kraft, who was a cousin of Kraft, apparently to provide janitorial services in Portland, Oregon. Kraft was responsible for the business administration of each of the businesses operated by the partnerships, and the other partner in each partnership was responsible for supervising employees and for negotiating contracts with building agents and managers for the performance of janitorial services by the partnerships.

In early 1969, Kraft formed yet another partnership to provide janitorial services in Santa Ana, California. His partner in this business was petitioner James Foy. Foy initially intended to work part time for that partnership, and he hoped that many of his insurance clients and contacts in Santa Ana would be a source of business for the new partnership. Foy did not like the name used for the prior partnerships formed by Kraft (namely, ADA Building Maintenance Co.), and Foy suggested and Kraft agreed that the name "Environment Control" be used for the new partnership. Both Kraft and Foy had equal 50-percent interests in that first Environment Control partnership. Similar to the division of

responsibilities in the earlier partnerships, Kraft was responsible for the business administration, and Foy was responsible for finding and negotiating contracts with potential customers. Foy's brother also worked for this partnership and supervised the janitorial work on the job sites.

In the middle of 1969, Kraft and Foy formed another partnership to provide janitorial services in Santa Barbara, California. That partnership also used the name "Environment Control," and Kraft and Foy had equal 50-percent interests therein. Again, Kraft was responsible for business administration, and Foy was responsible for finding and negotiating contracts with potential customers. In that regard, Foy spent 1 day a week in Santa Barbara meeting with potential customers and negotiating contracts. Later, the manager of the Santa Barbara partnership was given a 15-percent interest in the partnership, and Kraft's and Foy's interests were reduced to 42.5 percent each.

In late 1969, Kraft and Foy decided to expand their janitorial business to various cities throughout the United States by selling Environment Control franchises to local individuals or partnerships in the various cities. The Environment Control franchise network grew rapidly between the early 1970's and 1976 and spread to many cities throughout the United States and Canada, including Baltimore, Orlando, Cincinnati, and Toronto, to name just a few.

Environment Control Building Maintenance Co., Inc. (hereinafter referred to as ECI), was formed by Kraft in August of 1970, apparently to act as the named franchisor on the franchise agreements and to be responsible for the training and administrative responsibilities for which Kraft in his individual capacity previously had been responsible. Kraft was the sole shareholder and president of ECI, and it was by Kraft, as officer of ECI, that those administrative responsibilities were to be performed after ECI was organized. Foy was vice president of ECI. It is unclear whether Kraft received a salary from ECI during the years 1970 through 1976. Foy, however, did not receive a salary from ECI at any time.

Expansion Enterprises, Inc. (hereinafter referred to as Expansion), was formed by Foy prior to November of 1971, in order to assume many of Foy's rights, duties, and responsibilities with regard to the franchise network. Foy, however, was

the sole shareholder and president of Expansion, and it was by Foy, as officer of Expansion, that those duties and responsibilities were to be performed. Kraft was vice president and Foy's wife, Nancy, was secretary. The record does not indicate whether Foy, Kraft, or Foy's wife received a salary from Expansion.

A number of franchise agreements entered into by local franchisees doing business as part of the Environment Control franchise network, and the various agreements entered into between Foy, Kraft, ECI, and Expansion have been stipulated to. Under the local franchise agreements, the franchisee paid an initial franchise fee ranging from $5,000 to $25,000 to acquire the exclusive right to operate an Environment Control janitorial business within a designated geographic area. Generally, the geographic area covered by one franchise agreement was one city or metropolitan area. The agreements stated that the franchisee was an independent contractor and was neither in a partnership with, nor in a joint venture with, the franchisor.

The franchise agreements required the franchisor or its agents to negotiate contracts with building agents and managers under which the local franchisee would be entitled to perform janitorial services in return for a fee. Under the agreement, the franchisor also was obligated to negotiate a sufficient number of contracts, on behalf of the franchisee, with local customers so that within 18 months of the start of a local franchise, the franchisee would have received a specified level of fees for janitorial services rendered. That obligation of the franchisor will be referred to hereinafter as the "sales guarantee."

If the fees of the local franchise from janitorial services failed to meet the specified guaranteed amount, the franchisee would have the following three options: (1) Full refund of the initial franchise fee and relinquishment of the franchise; (2) partial refund of the franchise fee computed in accordance with the portion of the sales guarantee not satisfied; or (3) placement by the franchisor at the franchisor's expense of a salesman in the local franchisee's territory until the sales guarantee was satisfied. The franchisor also agreed periodically to inspect the local franchise operations.

The franchisee was entitled to retain 5 percent of gross sales[2] as compensation for janitorial services rendered. The franchisee also was entitled to retain 50 percent of the first $6,000 of net profits[3] during each calendar quarter and 75 percent of net profits in excess of the first $6,000. The franchisor, therefore, had a right to receive 50 percent of the first $6,000 of net profits, and 25 percent of net profits in excess of the first $6,000.

From the various documents, it is not completely clear who the franchisor was. Based upon the limited number of franchise agreements submitted by the parties, it appears that Kraft, in his individual capacity, signed the franchise agreements which were entered into prior to the end of 1971. We know, however, from the stipulation of facts and from agreements yet to be described that, from 1969 until the end of 1971, Kraft was in equal partnership with Foy and/or McCray as franchisor and that, with respect to some local franchises, other individuals also were in partnership with Kraft, Foy, and McCray as franchisor. However, the 1970 and 1971 franchise agreements do not acknowledge the other members of the partnership (namely, Foy and/or McCray), nor do they acknowledge Kraft's representative capacity in signing the franchise agreements on behalf of the other individuals.

Similarly, the three franchise agreements in evidence, which were signed after November of 1971, reflect simply the signature of ECI (Kraft's wholly owned corporation) as franchisor. The agreements themselves do not acknowledge that Foy and other individuals or entities may have been in partnership with or in a joint venture with Kraft and/or ECI.

We now turn to an analysis of the terms of each of the agreements entered into between Kraft, Foy, and their respective wholly owned corporations with respect to the Environment Control franchise network. It is important that we start with the first agreement between Kraft and Foy and understand the initial relationship between the individuals and then

---

[2] Gross sales were defined in the franchise agreements as the amount of all fees for franchise services less sales tax and less the amounts of any actual refunds, overcharges, and allowances.

[3] Net profits were defined in the franchise agreements as sales actually received resulting from operations of the franchise after payment of all expenses and liabilities. In the earlier franchise agreements in 1970 and part of 1971, the franchisee was entitled to retain 50 percent of the first $2,000 dollars of net profits, and 75 percent of net profits in excess of $2,000.

note changes or lack of changes in that relationship as reflected in subsequent agreements.

The first agreement between Kraft and Foy was entered into on October 14, 1969. Foy purchased from Kraft for $500 the exclusive right to establish and promote local Environment Control franchises in Southern California. At the same time, McCray purchased from Kraft for $500, the exclusive right to establish and promote local Environment Control franchises in Northern California. Under the October 14, 1969, agreement, the division (as between Kraft, Foy, and McCray on one hand and the local franchise operators on the other) of the initial franchise fees, profits, and "ownership" of the local franchises to be established in Southern and Northern California was to be as follows:

### SOUTHERN CALIFORNIA FRANCHISES

|  | Profits[4] | Franchise fees | Ownership |
|---|---|---|---|
| Kraft | 25% | 75% | 25% |
| Foy | 25 | 25 | 25 |
| Local franchise operators | 50 | - - - | 50 |
| Total | 100 | 100 | 100 |

### NORTHERN CALIFORNIA FRANCHISES

|  | Profits | Franchise fees | Ownership |
|---|---|---|---|
| Kraft | 25% | 75% | 25% |
| McCray | 25 | 25 | 25 |
| Local franchise operators | 50 | - - - | 50 |
| Total | 100 | 100 | 100 |

The October 14, 1969, agreement also provided that with respect to the nationwide franchise network which the participants in the agreement then contemplated, Kraft would be responsible for the business administration of all existing and new janitorial businesses operating under the Environment Control name, including bookkeeping and secretarial services, and the preparation of all legal documents necessary to establish the various local businesses. Foy and McCray would be responsible for the sales and promotion of Environment

---

[4]Profits percentages are derived from the ownership percentages.

Control businesses throughout the United States. They could either set themselves up as the local franchisees in the various locations or they could assist others to establish local Environment Control franchises. Foy and McCray were required to pay Kraft $500 for each State in which either of them actually exercised the right to become the exclusive salesman and promoter of Environment Control in a particular State. If neither Foy nor McCray exercised his exclusive rights to the promotion of Environment Control in a particular State, Kraft could then purchase such rights before they were offered for sale to some other individual. In that situation, it is not clear to whom Kraft would have paid the $500.

The individual who obtained exclusive rights to the promotion of Environment Control within a State or "franchise area" was responsible to start or to have started at least one Environment Control business within that State or area and to obtain a sufficient number of accounts so that each Environment Control local franchise within a State or area would generate at least $5,000 of receipts over the first 15 months of operation.

The individual who held the exclusive promotion rights with respect to Environment Control in a State or area also received a 25-percent "permanent ownership" interest in all Environment Control companies established within that franchise area. While not completely clear, the 25-percent "ownership" interest entitled the exclusive promoter (typically Foy or McCray), among other things, to 25 percent of all "profits" of each local franchise located within the promoter's particular State or area. It is not specified what percentage of the profits, if any, of each local franchise Kraft was to receive.

The October 14, 1969, agreement also provided that some type of unfunded retirement program would be established for Kraft, Foy, and McCray. Monthly retirement checks were to be based on a percentage of gross receipts of each local business that had been established within each individual's exclusive areas prior to retirement.

Additionally, under the October 14, 1969, agreement, Foy and McCray each, individually, had the "first right of refusal" with respect to any new franchisee. This apparently amounted to a right to veto any new proposed franchisee, whether or not

the new franchise was to be located in one of Foy's or McCray's respective States or territories.

The next agreement was entered into on January 8, 1970, between Kraft, Foy, and McCray, and purported to supersede the October 14, 1969, agreement. Under that agreement, Kraft, Foy, and McCray were to administer the nationwide Environment Control franchises through a corporation to be named Environment Control, Inc. Kraft, Foy, and McCray were to be stockholders of that corporation and were each to be required to sign all franchise agreements. The intended percentages of stock to be owned by each individual were not specified. However, the profits and fees received by the corporation and the "excess funds" of the corporation to be formed were to be shared as follows:

|  | Profits | Franchise fees | Excess funds[5] |
|---|---|---|---|
| Kraft | 50% | 40% | - - - |
| Foy | 25 | 30 | 50% |
| McCray | 25 | 30 | 50 |
| Total | 100 | 100 | 100 |

Their status as stockholders and their shares of profits, franchise fees, and excess funds, as indicated above, strongly suggest that Foy and McCray were to each hold a 25-percent equity interest in the corporation to be formed.

With respect to three specific local franchises in San Bernardino, Riverside, and Irvine, California, Foy was to receive 100 percent of the profits and fees received from local franchises in return for assisting the local franchises to reach the minimum $5,000 level of receipts for the first 15 months of business. That same modification of the typical split of profits and fees was made for McCray with respect to the San Jose, Visalia, and Oakland, California, local franchises.

Each of the three individuals was to have certain rights and responsibilities under the January 8, 1970, agreement. Kraft was to be in charge of the nationwide administration of all Environment Control businesses. Foy was to continue to search for new franchisees and to locate and negotiate new

---

[5]All "excess funds" were to be credited to the "Expense Account" and were to be split equally between Foy and McCray.

accounts for the franchises throughout the country. McCray was obligated to assist local franchises started after January 8, 1970, to meet their guaranteed sales levels. All three individuals continued to have the right to veto any new franchisee and were required to sign any agreement entered into with each new franchisee. All "commitments" made to additional sales representatives of Environment Control were solely the responsibility of Foy and McCray and were to be paid out of their respective profits or expense account funds.

The corporation proposed in the January 8, 1970, agreement was never incorporated. Apparently, in partial place thereof, in August of 1970 Kraft formed ECI, his wholly owned corporation.

On March 14, 1972, another written agreement was entered into between Foy, Kraft, and ECI, ECI being the successor in interest to Kraft, in order to ratify certain oral agreements entered into between Foy and Kraft. No explanation was offered as to why McCray was not a party to the March 14, 1972, agreement. That agreement specifically excluded from any of its provisions the rights and responsibilities of Kraft and Foy with respect to the Environment Control franchises located in Santa Ana, Santa Barbara, Fresno, San Gabriel, and Whittier, California, and in Portland, Oregon. Presumably, the rights and responsibilities of Kraft and Foy with respect to those franchises remained governed by the January 8, 1970, agreement.

Many of the provisions of the March 14, 1972, agreement were similar to the provisions of the earlier agreements. There were, however, significant differences. With regard to the split of profits, Foy was to continue to receive 25 percent of the net profits received from local franchises if the franchises reached a specified level of fees from their janitorial businesses. Also, since the franchise network by March of 1972 had expanded into Canada, Foy was to receive 25 percent of all net profits received from franchises established in that country. With regard to the split of franchise fees, Foy's share of the franchise fees was increased twofold from 30 percent under the prior agreement, to 60 percent (subject to certain reductions) under the March 14, 1972, agreement.

Also, under the March 14, 1972, agreement, Foy assumed all responsibility, *at his own expense*, for the sales guarantees

made to the local franchisees. As previously explained, this obligated Foy to find new accounts for the franchises and to assist the franchisees in reaching the specified level of fees from their janitorial businesses within a certain time period. If a franchise did not reach the specified level of fees, Foy assumed an unusually large personal responsibility with respect thereto. The March 14, 1972, agreement required Foy, in that instance, to reimburse the franchisee, out of his own funds, the initial franchise fee paid to acquire the local franchise. As previously noted, the fees ranged anywhere from $5,000 to $25,000 per franchise. If Foy had occasion to make any such reimbursement, complete ownership of the local franchise would vest in him, individually.

The March 14, 1972, agreement provided that Foy would receive 25 percent of any sales proceeds if the franchisor sold its ownership rights in the franchise network and the agreement restated Foy's right to veto any proposal to open up a territory to Environment Control franchises or to contract with a new franchisee. Lastly, that agreement provided that if ECI started any new company to perform janitorial services, Foy would receive a 25-percent ownership interest therein.

As we previously indicated, Foy formed a corporation which he named "Expansion Enterprises" sometime prior to October 14, 1971. On October 14, 1971, Foy apparently transferred to Expansion his interest in the profits and fees of Environment Control franchises and of any other businesses established by Foy, Kraft, McCray, and/or ECI in the janitorial or building maintenance industry. Profits and fees due Foy from certain Environment Control franchises were not transferred to Expansion. It appears that the transfer of Foy's profits and fees was simply an effort to shift the income he earned from the Environment Control franchise network from him, individually, to his wholly owned corporation. This transfer to Expansion did not include a transfer of Foy's responsibilities in connection with the Environment Control franchise network, and this transfer apparently did not include Foy's interest in any of the partnerships that had been formed prior to October 14, 1971, to operate local Environment Control franchises.

On June 20, 1972, Foy made a further transfer to Expansion, effective July 1, 1972, which included not only his profits and fees from the Environment Control franchise network but also what-

ever interests he had in the "franchises, partnerships (general or limited), and all other business entities in the building mainte- nance and janitorial business now or hereafter established." Again, Foy's interest in certain local franchises was excluded from this transfer. Neither ECI nor Kraft was a party to this transfer. Therefore, *insofar as Kraft and ECI were concerned,* under the earlier agreements of October 14, 1969, January 8, 1970, and March 14, 1972 (which had been entered into between Kraft, ECI, and Foy), *Foy individually* (not Expansion) continued to be responsible for Foy's duties and obligations under the prior agreements, and *Foy* (not Expansion) continued to be entitled to Foy's profits and fees and to Foy's interest in the Environment Control franchise network.

A fourth agreement was entered into on July 25, 1974. This time the parties to the agreement were ECI and Foy. Neither Kraft, McCray, nor Expansion was a party to that agreement. By its terms, the agreement only pertained to Environment Control franchises to be established after July 25, 1974, in limited partnership form. The local franchise investors and operators were to be the limited partners, and ECI was to be the named general partner. The initial capital contributions of the limited partners (the amounts of which presumably were comparable to the $5,000 to $25,000 initial franchise fees paid prior to that date), the net profits, and any proceeds from the sale of the franchisor's interest in a local franchise operated in limited partnership form were to be split as follows:

|  | Initial capital contributions | Net profits[6] | Sales proceeds |
|---|---|---|---|
| ECI | 55% | 75% | 75% |
| Foy | 45 | 25 | 25 |
| Total | 100 | 100 | 100 |

Foy continued to have primary if not sole responsibility for assisting the local franchises in finding customers and for meeting the guaranteed sales amounts. If the franchises' sales did not reach the guaranteed amounts, Foy continued to be personally responsible to pay the local franchises any differ- ence between actual sales and the guaranteed amounts.

On July 18, 1975, ECI and Foy entered into another

---

[6]Foy's net profits interest vested as each local franchise satisfied its guaranteed sales level.

agreement[7] which purportedly terminated the March 14, 1972, agreement as amended on July 25, 1974. The provisions of the 1975 agreement however were similar in most respects to the prior agreements between Foy and ECI. One change reflected in the July 18, 1975, agreement, pertained to the responsibility for the sales guarantees in certain franchise areas. ECI agreed to assume responsibility therefor with respect to the Chicago South; Hickory Hills; South Houston; and Connecticut II franchises. Foy agreed to retain responsibility for the sales guarantees for the franchises located in Northern Virginia; Oklahoma City, North; Oklahoma City, South; Southern Maryland; Valley Forge; and Philadelphia.

The July 18, 1975, agreement is silent as to who was responsible for the sales guarantees after July 18, 1975, with respect to the sales guarantees for all of the other Environment Control franchises (which sales guarantees, as we have indicated, were the responsibility of ECI under the local franchise agreements, but the responsibility of Foy under the March 14, 1972, agreement between ECI and Foy). The lack of reference in the July 18, 1975, agreement to the sales guarantees with respect to the numerous other local franchise locations probably is explained by the fact that the guaranteed sales amounts for those locations had been satisfied. The July 18, 1975, agreement also reconfirmed the following: that Foy had a 25-percent vested net profits interest in numerous local Environment Control franchises;[8] that Foy had a 50-percent

---

[7]In January of 1975, Foy sold 3 percent of his net profits interest in the Environment Control franchise network to two individuals for $26,250.

[8]The locations of the local franchises in which Foy had a vested net profits interest were:

| | | |
|---|---|---|
| Atlanta-East | Hickory Hills | San Bernardino |
| Bakersfield | Indianapolis | San Diego |
| Baltimore-East | Irvine | San Fernando |
| Baltimore-West | Kansas City, MO | San Francisco |
| Cincinnati | Kansas City, KS | San Jose |
| Columbus | Long Beach | Santa Monica Bay |
| Connecticut I | Los Angeles | Seattle |
| Connecticut II | Madison | South Houston |
| Chanel Islands | Milwaukee I | South Seattle |
| Chicago-South | Milwaukee II | St. Louis |
| Dallas | Minneapolis-North | Stockton |
| Des Moines | Minneapolis-South | Tampa |
| East Los Angeles | Oakland | Toronto |
| Eugene | Ontario | Tucson |
| Garden Grove | Orlando | West Portland |
| Glen Ellyn | Phoenix | |
| Hawaii | Sacramento | |

vested net profits interest in the Santa Ana franchise (however his net profits interest in the Santa Barbara franchise was reduced from 50 percent to 42.5 percent); that Foy's net profits interest vested in his heirs and assigns; and that Foy was to receive 25 percent of the gain realized by ECI from the sale of ECI's interest as franchisor in a local franchise.

On July 1, 1976, Foy and Expansion transferred their interests in the Environment Control franchise network to ECI for $290,000.[9] The parties to the transfer were ECI, Foy, and Expansion. Cash received by Foy and Expansion at the time of the transfer was $30,000. ECI also gave to Foy and Expansion a $260,000 promissory note payable over 63 months, commencing October 10, 1976, with an interest rate of 7.25 percent per annum. In the written agreement, the purchase price was allocated as follows: (1) $220,000 to Expansion's "royalty rights" in the Environment Control franchises;[10] (2) $35,000 to Foy's "royalty rights" in the Environment Control franchise in Santa Ana, California; and (3) $35,000 to Foy's "royalty rights" in the Environment Control franchise in Santa Barbara, California.

The July 1, 1976, transfer agreement, while quite unclear in many respects, does reflect a transfer to ECI of all of Foy's and Expansion's rights, interests, and responsibilities in the Environment Control franchise network. Only with respect to two cities (namely Kansas City, Kansas, and Oklahoma City, Oklahoma), did ECI transfer all of its interests and responsibilities in the Environment Control franchises located in those cities to Foy and Expansion. The "royalty rights," referred to in the July 1, 1976, transfer agreement, were essentially the same as the net profits interests referred to in prior agreements. Foy's and Expansion's rights to a share of any gain realized by ECI on a sale of the franchisor's interest in any of the Environment Control franchises were transferred to ECI. Foy and Expansion were relieved of all responsibility for the sales guarantees that had been made to the local franchises.

---

[9]There was no explanation in the stipulation of facts as to how this amount was arrived at, other than a representation in an affidavit of Kraft that the amount was based on an estimate of the future profits of the franchise network.

[10]The parties to the agreement treated Expansion as owning the vested "royalty rights" with respect to the franchises identified in note 8 *supra*, and with respect to the franchises designated as Chicago South; Hickory Hills; South Houston; and Connecticut II.

## OPINION

It is the Federal tax consequences of the July 1, 1976, transfer agreement which give rise to the instant controversy. Petitioners contend that their contract rights in the Environment Control franchise network constituted capital assets and that the transfer thereof constituted a sale or exchange. Respondent contends that petitioners only transferred their rights to receive ordinary income and that the transfer does not qualify as the sale or exchange of capital assets.

In order for the transfer of contract rights, such as those involved herein, to be entitled to capital gain treatment, the contract rights must qualify as capital assets under the broad definition of property found in section 1221, and the contract rights must not constitute any of the types of property excluded from capital gain treatment by sections 1221(1) through 1221(5).[11]

The following policy considerations and rule of construction concerning the term "capital asset" are well established:

The preferential treatment afforded by the capital gains provisions, 26 U.S.C.A. §§ 1201–1202, 1221–1223, was designed "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments * * *." *Burnet v. Harmel*, 287 U.S. 103, 106, 53 S.Ct. 74, 75, 77 L.Ed. 199. In *Commissioner of Internal Revenue v. Gillette Motor*

---

[11]The text of sec. 1221 provides as follows:

SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

(3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by—

(A) a taxpayer whose personal efforts created such property,

(B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or

(C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B);

(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or

(5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.

*Transport, Inc.*, 364 U.S. 130, 134, 80 S.Ct. 1497, 1500, 4 L.Ed.2d 1617, the Court held that it was "the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year." *Commissioner of Internal Revenue v. P.G. Lake, Inc.*, *supra*; *Burnet v. Harmel*, *supra*. To effectuate this Congressional purpose, the term "capital asset" is to be construed narrowly. *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29. [*Wiseman v. Halliburton Oil Well Cementing Co.*, 301 F.2d 654, 658 (10th Cir. 1962).]

See also *Elliott v. United States*, 431 F.2d 1149, 1155 (10th Cir. 1970); *Freese v. United States*, 455 F.2d 1146, 1150 (10th Cir. 1972).

No single definitive explanation is available of what types of property qualify as capital assets under section 1221. The Supreme Court in *Commissioner v. Gillette Motor Transport, Inc.*, 364 U.S. 130, 134 (1960), stated that, "not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset." Consistent with that statement, courts generally begin their analysis of this issue by determining what types of property do not constitute capital assets for purposes of section 1221. E.g., *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260, 265 (1958); *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46, 51–52 (1955); *Commissioner v. Ferrer*, 304 F.2d 125, 129–130 (2d Cir. 1962). We will begin at that same point, and we will mention first the statutory exclusions.

Section 1221 excludes the following five categories of property from the definition of capital assets: (1) Inventory; (2) depreciable personal property or real property used in a trade or business; (3) certain intangible property; (4) accounts receivable acquired in a trade or business; and (5) certain original issue discount obligations. Respondent does not contend that any of the statutory exclusions apply to the contract rights at issue herein.

Court decisions have recognized two additional limitations on the types of property which qualify as capital assets under section 1221. In *Corn Products Refining Co. v. Commissioner*, *supra* at 51, assets that were an integral part of a taxpayer's business were held not to qualify as capital assets. In that case, the Supreme Court held that although corn futures contracts did not fall within the statutory exclusions, profits received

from the purchase and sale of futures contracts entered into in order to assure a reasonably priced supply of corn inventory for the taxpayer's business did not qualify for capital gain treatment because, "Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss." 350 U.S. at 52. Respondent does not contend, herein, that petitioners' contract rights fall within the limitation which *Corn Products* places on capital asset treatment.

The second court-imposed limitation on the types of property which qualify as capital assets was expressed by the Supreme Court in *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260 (1958). Thereunder, a mere right to receive ordinary income generally will not qualify as a capital asset. The issue in *P.G. Lake* was whether a transfer of a royalty right associated with the production of oil was a sale of a capital asset. After the transfer, the taxpayer retained a reversionary interest in the underlying oil and gas leases, and the purchaser acquired nothing more than a right to receive a portion of the royalties for a limited period of time. The Supreme Court noted that the amount received for the transfer was virtually equivalent to the amount of royalty income to be received after the transfer. The Court concluded that the only right the taxpayer sold was the right to receive future ordinary income and held that the royalty right was not a capital asset. The Court explained as follows:

The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property. [356 U.S. at 266.]

Subsequent decisions have attempted to clarify the holding of the Supreme Court in *P.G. Lake*. With respect to the broad proposition that amounts received for the transfer of a right to receive future income will not qualify for capital gain treatment, the Fifth Circuit in *United States v. Dresser Industries, Inc.*, 324 F.2d 56 (1963), stated—

As a legal or economic position, this cannot be so. The only commercial value of any property is the present worth of future earnings or usefulness. If the expectation of earnings of stock rises, the market value of the stock may rise;

at least a part of this increase in price is attributable to the expectation of increased income. The value of a vending machine, as metal and plastic, is almost nil; its value arises from the fact that it will produce income. [324 F.2d at 59.]

In applying the *P.G. Lake* limitation on what property qualifies as a capital asset, courts generally consider the entire economics of a transaction, as suggested by *Dresser Industries* in the above quotation, and evaluate all of the rights of the taxpayer, as well as all of the risks and obligations of the taxpayer associated with his ownership of the property prior to the transfer. For example, in an attempt to explain *P.G. Lake*, we stated in *Guggenheim v. Commissioner*, 46 T.C. 559 (1966)—

The Court in *Lake* was faced with the problem whether a transfer of part of a capital asset is itself the transfer of a capital asset. That part was defined and delineated by the taxpayer in such a manner as to consist essentially of only the rights to income. The transferee assumed few of the risks identified with the holding of a capital asset; he assumed only a nominal risk of his oil payment right decreasing in value and none of the possibility of the oil payment right increasing in value. On the other hand, the taxpayer, after the transfer, retained essentially all of the investment risks involved in his greater interest to the same extent as before the transfer. [46 T.C. at 569.]

Based upon the above statement, whether investment risks were associated with the contract rights transferred is a particularly relevant consideration in determining whether the rights constituted a capital asset.

A further example of how the courts analyze all of the rights and responsibilities of the taxpayer is found in *Commissioner v. Ferrer*, 304 F.2d 125 (2d Cir. 1962). Therein, the Second Circuit analyzed whether the taxpayer's "bundle of rights" included "equitable interests" similar to those of an owner of property, and the Second Circuit specifically mentioned invested capital and investment risks as factors which generally give rise to an equitable interest. 304 F.2d at 131–133. That case concerned the transfer of the right to produce a play. The taxpayer also transferred his rights to control all motion picture, radio, and television productions of the play and his right to receive a share of the proceeds from the distribution of a motion picture of the play. The Second Circuit noted that the right to control all productions of the play (including motion picture, radio, and television productions thereof) were equitable rights which were in the nature of the rights of an owner of

property. It was concluded that those rights constituted "something more than an opportunity, afforded by contract, to obtain periodic receipts of income," and they were held to be capital assets. *Commissioner v. Ferrer*, 304 F.2d at 130.

With regard to the transfer of the additional right to receive a share of the proceeds from the distribution of a motion picture of the play, the court noted that the original copyright owner of the play expressly had reserved both legal and equitable rights in any motion picture of the play. Therefore, the court concluded that the taxpayer did not have an interest in the underlying motion picture, itself, but only an interest in a share of the proceeds from the motion picture. That right did not qualify as a capital asset, but was simply a right to receive ordinary income in the future.[12]

The basic proposition of *P.G. Lake* is still viable. Where the taxpayer *merely* "substituted the right to receive ordinary income from one source for the right to receive ordinary income from another [source]," the rights transferred will not be considered a capital asset. *United States v. Dresser Industries, Inc.*, 324 F.2d at 59.

The substitution of ordinary income was underlying the Tenth Circuit's decision in *Wiseman v. Halliburton Oil Well Cementing Co.*, 301 F.2d 654 (1962). Therein, the Tenth Circuit considered the rights of a taxpayer under a contract to use a patented process and to issue sublicenses to third parties with respect to the process. The taxpayer held an exclusive right to use the process and the right to issue sublicenses to third parties in return for royalties, subject to the approval of the corporation that had developed the process and that had obtained the patent rights thereto. The taxpayer exchanged its exclusive rights to use the process and to issue sublicenses, for nonexclusive rights only to use the process and to receive a portion of the royalties that the corporation was to receive from issuing licenses directly to third parties. The court determined that the conversion of the licensing rights from

---

[12]This Court in *Michot v. Commissioner*, T.C. Memo. 1982–128, adopted an approach similar to that taken in *Ferrer* and concluded, among other things, that the taxpayer's royalty interest in a Burger Chef franchise represented a capital asset because it arose out of substantial goodwill and out of the taxpayer's right to exclude others from participating in similar franchises within a specified area, but that the taxpayer's gain attributable to his release of any claim to already earned commissions was ordinary income. 43 T.C.M. 792, at 796; 51 P-H Memo T.C. par. 82,128, at 542–82.

exclusive to nonexclusive rights merely substituted the source from which the taxpayer was to receive ordinary income.

The Tenth Circuit in *Halliburton Oil* further suggested that how the taxpayer acquired the licensing rights and how the licensing rights originated were also relevant factors in determining whether the rights transferred constituted a capital asset. The court emphasized that the taxpayer therein was simply a licensor of the patented process. The taxpayer had not participated in the initial development of the process, nor in obtaining the patent rights thereto, and the taxpayer had no right to control to whom the licenses or sublicenses were given. 301 F.2d at 658.

One situation that illustrates particularly well the proposition that amounts received primarily in lieu of ordinary income will not qualify for capital gain treatment involves the right to receive compensation for personal services. Two Tenth Circuit cases illustrate that situation. In *Elliott v. United States*, 431 F.2d 1149 (1970), the Tenth Circuit considered the tax consequences of payments received by a general agent of an insurance company for the termination of his agency contract under which he had the right to sell insurance in return for commissions. The court held that the contract was only a contract of employment and that the amount received on the termination thereof represented simply a substitute for future ordinary income that the general agent would have received under the employment contract.

In *Freese v. United States*, 455 F.2d 1146 (10th Cir. 1972), the Tenth Circuit considered the tax consequences of amounts received under an employment contract which provided that in addition to a fixed salary, the employee would receive an amount equal to 10 percent of the profits of the employer's business and 10 percent of the proceeds from the sale of any of the employer's assets. The Tenth Circuit again found that since the underlying contract rights were based simply on the employee status of the taxpayer and on the personal services rendered by the employee in that capacity, the amounts received by the employee under the employment contract on the sale of the employer's assets did not qualify for capital gain treatment.

To summarize, in determining whether the taxpayer's contract rights that were transferred constituted a capital asset,

courts generally consider all aspects of the bundle of rights and responsibilities of the taxpayer that were transferred, specifically including the following six factors:

(1) How the contract rights originated;

(2) How the contract rights were acquired;

(3) Whether the contract rights represented an equitable interest in property which itself constituted a capital asset;

(4) Whether the transfer of contract rights merely substituted the source from which the taxpayer otherwise would have received ordinary income;

(5) Whether significant investment risks were associated with the contract rights and, if so, whether they were included in the transfer; and

(6) Whether the contract rights primarily represented compensation for personal services.

We must now apply the law, as set forth above, to the facts of this case. Petitioners contend that their contract rights represented an equitable interest in the Environment Control franchise network that was evidenced by the various contracts they entered into with Kraft and ECI. Petitioners further contend that the contract rights constituted capital assets and that the 1976 disposition thereof was a sale which qualifies for capital gain treatment. Respondent however argues that the contract rights did not qualify as capital assets.[13] Respondent further argues that petitioners have not satisfied the sale or exchange requirement of section 1222. We agree with petitioners.

We reiterate that the relevant written agreements used extremely imprecise and vague language, which makes most difficult our determination as to the character of the rights and obligations of petitioners and of the other parties thereto. We do not consider ourselves bound in every instance by the express terms that the parties used in the various contracts, and we will examine the history and nature of the contract rights in order to determine whether the rights transferred constituted capital assets. See *Freese v. United States*, 455 F.2d at 1151.

Although the Second Circuit separated the taxpayer's bundle of rights in *Commissioner v. Ferrer*, 304 F.2d at 131, into

---

[13]If the various contracts between Foy, Expansion, Kraft, and ECI were held to rise to the level of a partnership, then further analysis would be required with respect to whether there was a sale of any unrealized receivables as that term is defined in sec. 751(c). Neither party, however, has raised that issue, and we decline to do so.

separate, distinct rights, petitioners and respondent herein take an "all or nothing" approach and treat petitioners' contract rights collectively. We also adopt that approach, and we note that petitioners' various rights were all so interrelated that no separation of petitioners' rights appears appropriate under the particular facts involved herein.

The key question in our analysis is whether petitioners were so involved in the development and operation of the nation-wide Environment Control franchise network that the rights and responsibilities therein which they sold constituted proprietary or equitable interests, similar to those of an owner of property. Foy was one of the founders of the Environment Control business. He was responsible for the name of the company, and it appears that he was the key individual responsible for the rapid growth and expansion throughout the country of Environment Control franchises. He located new franchisees and negotiated building maintenance contracts for the local franchises. Particularly significant is the fact that for most of the years of their involvement with Environment Control both Foy, personally, and Expansion, as a corporation, were responsible for the sales guarantees which were made to the franchises. Such financial and business risks are not typically assumed by mere employees or salesmen who have no ownership interest in the business. The right to veto new franchisees and the right to share in sales proceeds if the "owner" sells his interest, which rights petitioners had, are not typically bestowed upon mere employees and are indicative of the rights of an owner of property.

The ownership interest of Foy (and the source of the ownership interest Expansion eventually received through Foy) is best reflected in the provisions of the January 8, 1970, agreement between Kraft, Foy, and McCray. Therein, Foy was to become a shareholder of the corporation that was to be formed to incorporate the franchise organization. He was to receive 25 percent of all profits of the corporation, 30 percent of the initial franchise fees, and 50 percent of all funds to be placed in a special account for accumulation. That intended division of all corporate profits, fees, and accumulated funds is evidence of an ownership interest. Throughout all of the years, up until the transfer in 1976, Foy and/or Expansion retained essentially the same or an increased share of all profits, fees,

and accumulated funds of the Environment Control franchise network, that was reflected in the first significant agreement between the individuals (namely, the January 8, 1970, agreement).

The fact that the umbrella corporation (that was to be formed to own and operate the Environment Control network) was never formed (and that, instead, Foy and Kraft separately incorporated their respective portions of their ownership interests in the Environment Control business) in no way detracts from the nature of those separate ownership interests. Accordingly, when the interests of Foy and Expansion were transferred in 1976 to ECI, Foy was effectively transferring his direct and indirect (through Expansion) ownership interests in the Environment Control franchise network, and Kraft and ECI were acquiring those ownership interests.

The predominant and overwhelming nature of petitioners' interests in the nationwide franchise network was similar to, if not in fact, that of an equity owner, and therefore petitioners' interests in the Environment Control franchise network constituted substantially "more than an opportunity, afforded by contract, to obtain periodic receipts of income." *Commissioner v. Ferrer*, 304 F.2d at 130. Based upon the facts and law as analyzed above, we conclude that the interests of Foy and Expansion that were transferred in 1976 constituted capital assets.

Having determined that petitioners' contract rights constituted capital assets, it must be determined whether the transfer of petitioners' contract rights constituted a sale or exchange under section 1222. A sale has been defined as a "transfer of property for a fixed price in money or its equivalent." *Commissioner v. Brown*, 380 U.S. 563, 571 (1965). In that regard we previously stated that—

"Congress intended the words 'sale or exchange' to have a broad meaning, not to be limited to the standard transfer of property by one person to another in exchange for a stated consideration in money or money's worth." *Freeland v. Commissioner*, 74 T.C. 970, 980 (1980) * * * we note that the courts have tended to reject technicalities and focus on the nature of the rights relinquished; if it was a capital asset, the release of a right is generally characterized as a capital gain. [*Arkin v. Commissioner*, 76 T.C. 1048, 1055 (1981).]

Therefore, the terms "sale or exchange" in section 1222 include transactions in which all rights to property or all rights to a portion thereof have been transferred permanently from one party to another.

Petitioners' rights that were transferred to ECI were not merely extinguished, but were rights that were transferred to ECI and that ECI now holds. Furthermore, respondent has conceded this issue in the stipulation of facts.[14] We therefore reject respondent's argument that there was no sale or exchange.

As previously indicated, if rights under a contract constitute a franchise, section 1253[15] may prevent the taxpayer from receiving capital gain treatment on their sale where, among other things, the taxpayer retains a significant interest in the franchise after the sale. Respondent herein, however, does not argue that section 1253 prevents petitioners from receiving capital gain treatment for the transfer in question.[16]

---

[14]Stipulation of facts par. 36 "On July 1, 1976 [Expansion] and Foy *sold* all of their rights to ECI as set forth in Exhibit 13-M." (Emphasis added.)

[15]Sec. 1253(a) and (b) provides as follows:

SEC. 1253. TRANSFERS OF FRANCHISES, TRADEMARKS, AND TRADE NAMES.

(a) GENERAL RULE.—A transfer of a franchise, * * * shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise, * * *

(b) DEFINITIONS.—For purposes of this section—

(1) FRANCHISE.—The term "franchise" includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area.

(2) SIGNIFICANT POWER, RIGHT, OR CONTINUING INTEREST.—The term "significant power, right, or continuing interest" includes, but is not limited to, the following rights with respect to the interest transferred:

(A) A right to disapprove any assignment of such interest, or any part thereof.

(B) A right to terminate at will.

(C) A right to prescribe the standards of quality of products used or sold, or of services furnished, and of the equipment and facilities used to promote such products or services.

(D) A right to require that the transferee sell or advertise only products or services of the transferor.

(E) A right to require that the transferee purchase substantially all of his supplies and equipment from the transferor.

(F) A right to payments contingent on the productivity, use, or disposition of the subject matter of the interest transferred, if such payments constitute a substantial element under the transfer agreement.

(3) TRANSFER.—The term "transfer" includes the renewal of a franchise * * *

[16]We agree with respondent that sec. 1253 is not applicable to the instant dispute because petitioners did ·not retain any significant power, right, or continuing interest with respect to anything that they transferred to ECI in the July 1, 1976, agreement, nor did petitioners receive amounts on account of a sale of a franchise that were contingent on the productivity, use, or disposition of a franchise. See sec. 1253(c).

The next issue for our consideration is whether the proceeds received by Foy and Expansion qualify under section 453 for the installment method of reporting. Section 453(b) identifies the following four requirements with respect to reporting a casual sale of personal property on the installment method: (1) The sale must be of personal property; (2) the property must not be inventory with respect to the taxpayer; (3) the sales price must be in excess of $1,000; and (4) payments, if any, received in the year of sale must not exceed 30 percent of the selling price.[17] Also, if the proceeds were received as compensation for personal services, they may not be reported under the installment method. *Sorenson v. Commissioner*, 22 T.C. 321 (1954).

Petitioner contends that the transfer in question was a casual sale of personal property and that all four requirements of section 453 are met. Respondent contends that petitioners did not have any "property" to sell, that there was no sale, and that, if there was a sale, the sales proceeds were received as compensation for personal services and cannot be reported under the installment method. We again agree with petitioners. Our holding on the first issue has determined that the petitioners did transfer property, that the transfer constituted a sale, and that the sales proceeds were not received as compensation for personal services.

In *Realty Loan Corp. v. Commissioner*, 54 T.C. 1083 (1970), affd. 478 F.2d 1049 (9th Cir. 1973), the taxpayer sold its mortgage servicing business. One of the issues concerned

---

[17]Sec. 453(b) provides as follows:

SEC. 453. INSTALLMENT METHOD—
  (b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—
    (1) GENERAL RULE.—Income from—

      *     *     *     *     *     *     *

    (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,
may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).
    (2) LIMITATION.—Paragraph (1) shall apply—
      (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—
        (i) there are no payments, or
        (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 per cent of the selling price.

whether the taxpayer's rights to receive future income under a contract qualified as personal property for installment reporting purposes. In concluding that the contract rights so qualified, the court observed that the mere fact that the amount received by the taxpayer was in lieu of income which would have been received over a period of years was "no reason for prohibiting the use of the installment method of reporting that income." 54 T.C. at 1098.

One further issue for consideration concerns the addition to tax under section 6651(a). An addition to tax under section 6651(a) was determined by respondent for Expansion's failure to file timely its Federal income tax return for its taxable year ending September 30, 1975. Additions to tax under section 6651(a) are presumed correct and are generally upheld, unless the taxpayer presents evidence controverting their applicability. See *Abramo v. Commissioner*, 78 T.C. 154, 163 (1982). Expansion has presented no evidence to dispute respondent's determination. Accordingly, we hold for respondent as to this addition to tax.

In light of the above conclusions,

> *Decision will be entered for the petitioners in docket No. 10976–81.*
> *Decision will be entered under Rule 155 in docket No. 10977–81.*