B. D. MORGAN & CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; CHARLES E. AND MARILYN J. MORGAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
B.D. Morgan & Co. v. Commissioner
Docket Nos. 16246-85; 27321-85.[1]
United States Tax Court
T.C. Memo 1988-569; 1988 Tax Ct. Memo LEXIS 602; 56 T.C.M. (CCH) 855; T.C.M. (RIA) 88569; December 15, 1988
Robert W. Buechner, for the petitioners. Robert J. Kastl and Terry L. Zabel, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax for their 1981 taxable years in the following amounts: Additions to Tax
Section
Section
Section
Section
Petitioner
Deficiency
[2] 6651(a)(1) 6653(a)(1)
6653(a)(2)
6659 B.D. Morgan &
$ 48,656.74
None
$ 2,432.84
50% of  $ 12,224.80
Co.
interest
due on
$ 48,656.74
Charles E. &
$ 2,728.49 $ 17.02
$ 832.94  50% of  None
Marilyn J.
interest
Morgan
due on
$ 2,728.49
*606 In the notices of deficiency sent to these petitioners, respondent also determined that section 6621(c) (formerly section 6621(d)) [3] dealing with interest on substantial underpayments attributable to tax motivated transactions was applicable. The issues for decision are (1) whether MSS Associates, Ltd.'s ("MSS Associates") computer software activity represented an activity not engaged in for profit in 1981; (2) whether petitioner B.D. Morgan & Co., Inc. ("B.D. Morgan") is entitled to an investment tax credit on the computer software leased by MSS Associates; (3) whether petitioners Charles and Marilyn Morgan failed to file timely their 1981 Federal income tax return and are, therefore, liable for an addition to tax pursuant to section 6651(a)(1); (4) whether petitioner B.D. Morgan is liable for an addition to *607 tax under section 6659 for a valuation overstatement; (5) whether all petitioners are liable for additions to tax under sections 6653(a)(1) and (2) for negligence or disregard of rules or regulations; and (6) whether all petitioners must pay additional interest on an underpayment attributable to a tax motivated transaction as defined in section 6621(c). FINDINGS OF FACT Petitioner B.D. Morgan was incorporated on January 1, 1941, under the laws of the State of Ohio to engage in and conduct a construction business. The address of its principal place of business was in Middletown, Ohio, at the time it filed its petition in this case. B.D. Morgan filed a U.S. Corporation Income Tax Return, Form 1120, for the taxable year 1981 with the Cincinnati Service Center, Covington, Kentucky. On March 8, 1985, respondent issued a statutory notice of deficiency to B.D. Morgan relating to the company's 1981 taxable year. Petitioners Charles and Marilyn Morgan resided in Middletown, Ohio at the time they filed their petition in this case. The Morgans filed their purported joint Federal income tax return, Form 1040, for the taxable year 1981 with the Cincinnati Service Center, Covington, Kentucky. *608 On April 19, 1985, respondent issued a statutory notice of deficiency to the Morgans concerning their taxable year 1981. MSS Associates was a limited partnership formed in 1981 under the laws of the State of Texas. Edwin Morrow was the general partner of MSS Associates in 1981 and was authorized to act on behalf of the limited partnership. MSS Associates filed partnership returns for the taxable years 1981, 1982, 1983, and 1984 showing total gross receipts on sales of $ 540 [4] and ordinary losses approximately equalling $ 340,000 over that four-year period. In 1981, B.D. Morgan, through its president, Charles Morgan, purchased three partnership units in MSS Associates. In that same year, Charles Morgan personally purchased one partnership unit in MSS Associates. [5] Mr. Morgan purchased the partnership units at the urging of Mr. Morrow, the individual with whom Mr. Morgan dealt in the purchase of annuities and life and health insurance. *609 A medical specialists computer software package (sometimes referred to hereinafter as "Medical Specialists System" or the "System" or the "Software") was developed by Roy Brown, Jr., president of Micro Computer Systems, Inc. ("MCS") By an agreement dated October 12, 1981, the Medical Specialists System was sold by MCS to Shales Technology Corporation, Inc. ("Shales"). Under this October 12th agreement, MCS agreed to transfer the Medical Specialists System to Shales upon Shales' delivery to MCS of two notes, a $ 20,000 short-term note and a $ 1,180,000 long-term note. The short-term note was payable in 80 days and bore a 10 percent interest rate. [6] The long-term note was payable in 15 years from the date of its execution, October 12, 1981, and bore a 10 percent interest rate. "The principal of [the long-term] note [was to] be prepaid in the amount of 20% of the gross revenue of [Shales] attributable, during each calendar quarter beginning with January 1, 1982, to [Shales'] acquisition of the [System]." The remainder of the principal and interest, if any, was payable on the long-term note's due date. The Medical Specialists System was the only collateral securing both *610 notes. During the period from October 12, 1981, to the date of trial, February 11, 1986, total cash paid to MCS by Shales relative to the System was $ 27,000. By an agreement dated November 1, 1981, Shales sold the Medical Specialists System to Software Technology Corporation, Inc. ("Software Tech"). Under these corporations' purchase agreement, dated November 1, 1981, the price for the System was set at 20 percent of all cash or receipts derived from Software Tech's sale or commercial exploitation of the property. By an agreement dated December 30, 1981, Software Tech sold the Medical Specialists System to First Savings Financial, Inc. ("FSF"). Under this agreement, FSF was to pay Software Tech $ 8,000,000. Of this sum, $ 114,750 was due upon the agreement's execution date, $ 85,250 was due on May 31, 1982, and the remainder -- $ 7,800,000 -- was covered under a promissory note bearing interest at the rate of nine percent per annum and maturing on December 31, 1996. *611 Payments on the note were due quarterly and were equal to a percentage of the gross revenues generated from the System's sale or use. During the period from December 30, 1981, to the date of trial, the total cash paid to Software Tech by FSF relative to the Medical Specialists System was $ 196,000. The sole business of FSF was the leasing of computer software with the single exception of its leasing office equipment to one eye doctor. FSF was the lessor of four separate computer software products in 1981. MCS and Shales were former owners of these computer software products. In 1981, Shales, Software Tech, and FSF were all located at 1984 Campbell Center 1, Dallas, Texas. Additionally, Anthony Russo, president of Software Tech, and Kenneth Klein, president of FSF, were partners in an accounting business in New York City. By an agreement dated December 31, 1981, MSS Associates leased the Medical Specialists System from FSF for a period of 96 months. Mr. Morrow took possession of the System's master diskettes on December 20, 1981. The lease agreement between MSS Associates and FSF provided for $ 230,480 due upon execution of the lease as rent for 1981 and $ 40,659 as minimum *612 pre-paid rent together with additional rent of 65 percent of the gross receipts received from the System's marketing. Furthermore, the lease agreement was signed in blank by Mr. Klein, president of FSF. Mr. Morrow typed in the rental terms for the lease of the Medical Specialists System on or after December 30, 1981. The System was written in the computer programming language called IN BASIC and was designed to utilize an operating system called control program for microprocessors or CP/M. The CP/M operating system represented a declining state-of-the-art in 1981. In the fall of 1981, IBM introduced the IBM-PC. This computer employed a disk operating system labelled PC-DOS. With further enhancements to this computer in 1982, IBM became a standard bearer for the industry. Software products employing PC-DOS or other closely related operating systems, most notably the micro-soft disk operating system or MS-DOS, proliferated while those employing the CP/M operating system waned. The Medical Specialists System was consequently not marketable while it utilized the CP/M operating system. The System contained nothing innovative. Moreover, its development should not have required *613 any further research or experimentation. The System did not use any new technology, did not represent a substantial improvement over existing software available on the market, and did not have any new ideas associated with it to give it any market advantage over similar products. [7]
Converting an IN BASIC computer package like the Medical Specialists System from the CP/M operating system to the MS-Dos/PC-Dos operating system is not a major undertaking and could have been done in 1981. MSS Associates did not, however, make substantial and satisfactory progress on this conversion until six weeks prior to the trial of this case, February 11, 1986, when Mr. Morrow hired Victor Andre. Furthermore, the System would not be in a final marketable form until at least an additional five months had passed from the date of this case's trial. [8] No evidence exists that a copy of *614 the Medical Specialists System had ever been sold by MSS Associates. MSS Associates claimed a rental deduction of $ 266,000 for the lease of the Medical Specialists System for the taxable year 1981. The partnership also claimed in this same taxable year a $ 10,000 deduction related to expenses incurred in promotion and distribution. In 1982, MSS Associates claimed a $ 23,408 deduction for promotion and distribution expenses. In 1983 and 1984, no promotion and distribution expenses were claimed by MSS Associates. Additionally, in none of these four taxable years did MSS Associates claim deductions which were clearly traceable to the conversion of the System to the micro-soft disk operating system. Returns filed by petitioners for the taxable year 1981 included substantial losses *615 linked to petitioners' purchases of partnership interests in MSS Associates. Petitioner B.D. Morgan claimed an investment tax credit for 1981 with respect to the Medical Specialists System based on a value of the Software of approximately $ 8,000,000. Petitioners Charles and Marilyn Morgan did not claim an investment tax credit for 1981 with respect to the System. In valuing the System, both respondent and petitioners presented the testimony of their respective experts. Petitioners provided the testimony and report of Victor Andre, the individual Mr. Morrow employed to convert the System to a program utilizing the micro-soft disk operating system. Respondent presented the testimony and appraisal report of Drs. Michael Vanecek and Carl Guynes, both professors in the Department of Business Computer Information Systems at North Texas State University. The Morgans' purported joint Federal income tax return, Form 1040, for the taxable year ended December 31, 1981, was received by the Cincinnati Service Center on May 24, 1982. This return was sent to the Service in an envelope with a postmark cancellation date of May 22, 1982. The return's paid preparer, Mrs. William Church, dated *616 her signature as of April 15, 1982. On this return, no date appears by the signatures of either Mr. or Mrs. Morgan. In the return's signature block, the phrase "under penalties of perjury" is excised by a line crossing through these words. OPINION Petitioners' entitlements to the losses and investment tax credit attributable to their purchased interests in MSS Associates initially rest on their establishing that MSS Associates' leasing and marketing of the Medical Specialists System represented an activity engaged in for profit. [9]Flowers v. Commissioner,80 T.C. 914, 931 (1983); Pike v. Commissioner,78 T.C. 822, 841-842 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984); Rule 142(a). Noting such, we initially focus our attention on the issue of whether MSS Associates' leasing and marketing of the System falls without the limitations of section 183.
*617 Section 183 imposes limitations on deductions attributable to activities not engaged in for profit. The term "activity not engaged in for profit" is defined in section 183(c) as any activity other than one with respect to which deductions are allowable under section 162, relating to expenses paid or incurred in carrying on a trade or business, or under paragraph (1) or (2) of section 212, relating to expenses paid or incurred for the production of income or for the management, maintenance or conservation of property held for the production of income. Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981). Whether an activity is engaged in for profit is determined under sections 162, 212(1) and 212(2) except insofar as section 183(d) creates a presumption that the activity is engaged in for profit. Sec. 1.183-1(a), Income Tax Regs. This exception is not, however, applicable in the instant case. In this case, the test of whether or not the activity was engaged in for profit is applied at the partnership level. Brannen v. Commissioner,78 T.C. 471, 500-501 (1982), affd. 722 F.2d 695 (11th Cir. 1984). It is essential under the applicable *618 standard of section 183 that petitioners demonstrate that MSS Associates had "an actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dean v. Commissioner,83 T.C. 56, 74 (1984). A determination of whether the requisite profit objective exists is one of fact to be resolved on the basis of all facts and circumstances. Elliott v. Commissioner,84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986). See also sec. 1.183-2(a), Income Tax Regs. The burden of proof is upon petitioners (Rule 142(a); Flowers v. Commissioner,80 T.C. at 931-932; Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981)), with greater weight to be placed upon objective facts. Sec. 1.183-2(a), Income Tax Regs.; Churchman v. Commissioner,68 T.C. 696 (1977). Section 1.183-2(b), Income Tax Regs., lists some relevant factors to *619 be taken into consideration in the determination of a profit motive's existence. Such factors include: (1) the manner in which the activity's existence is conducted; (2) the expertise of the individuals or entities conducting the activity and of their advisors; (3) the time and effort expended by those conducting the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of those conducting the activity in carrying on other similar or dissimilar activities; (6) the conducting party's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the conducting party; and (9) whether elements of personal pleasure or recreation are involved. These factors are not exclusive and are to be applied according to the facts of each case. Sec. 1.183-2(b), Income Tax Regs. Accordingly, no one factor, nor a majority of the nine factors, need be considered to be determinative. Golanty v. Commissioner,72 T.C. at 426-427. In considering the manner in which the activity at issue was conducted, we note the actions of Edwin Morrow, the general partner *620 and agent of MSS Associates. Mr. Morrow, on behalf of MSS Associates, entered into a 96-month lease with FSF for the Medical Specialists System. No corroborating evidence exists in the record, however, which would suggest that prior to executing the lease, Mr. Morrow had familiarized himself with the value, marketability, or quality of the Software. No substantiated evidence suggests that Mr. Morrow commissioned an outside appraisal of the Software prior to entering into the lease agreement or that he apprised himself of the Software's inherent deficiencies. The Medical Specialists System was not innovative. The Software utilized an operating system that was a declining state-of-the-art in 1981. Further, the System did not contain any new ideas or technology, and it did not include any improvements over existing software available in the marketplace. We also look askance at the series of transfers through which MSS Associates acquired the System. The Software theoretically changed hands through sales or leases four times during the period from October 12, 1981, through December 31, 1981. During this 80-day period, the purported transfer price of the Medical Specialists System *621 increased over six-fold while the actual cash received by the transferors was consistently a small percentage of the stated price. Additionally, the three corporate purchasers of the System, Shales, Software Tech, and FSF, were all located, in 1981, at the same Dallas address. The presidents of Software Tech and FSF were partners in the same New York City accounting business. These facts suggest that the Software's transfer prices were not the product of arm's-length negotiations and that the System's value was a fraction of the stated transfer prices set forth in the respective agreements. Moreover, we find peculiar the fact that Edwin Morrow took possession of the System's master diskettes and removed them from Dallas, Texas, before the System was sold to FSF or leased to MSS Associates. It is inconceivable that a lessor would enter into a lease for an asset purportedly worth $ 8,000,000 and nonchalantly permit the potential lessee to take possession of the leased asset before the lessor had gained title to the asset and secured its lease in a written agreement. A further peculiarity can be found in Mr. Klein's signing a blank lease agreement and permitting the lessee's agent, *622 Mr. Morrow, to add omitted terms later. [10]
An examination of deductions claimed by MSS Associates in taxable year 1981 and subsequent years gives us an additional insight into the motive underlying the *623 partnership's formation. During these years and through the date of trial, the System represented the only asset -- the make-or-break asset -- possessed by MSS Associates. This single product, nonetheless, was unmarketable at the time of its lease and remained so through the trial date. In spite of the Software's inherent unmarketability, MSS Associates claimed deductions in 1981 and 1982 tied to the product's promotion and distribution. At least through the taxable year 1984, however, no expenses were claimed by the partnership which were clearly traceable to the System's conversion to the micro-soft disk operating system. From these facts we consequently conclude that Mr. Morrow, as MSS Associates' agent, failed to take appropriate, timely steps satisfactorily to convert the software and to correct its deficiencies. [11] Mr. Morrow's failure to recognize the Software's deficiencies and marketability problems reflects his lack of expertise regarding the sale of computer software. This failure further suggests that adequate steps were not taken to secure for the Software any future appreciation in value based on the System's gaining market share in an already crowded and competitive *624 field. The total failure of MSS Associates, Ltd. to generate anything other than losses and tax credits while purportedly engaging in the business of selling computer software and the failure by Mr. Morrow to correct, or expend monies to correct, the deficiencies which rendered the Software unmarketable demonstrate that profit was not the objective for MSS Associate's engaging in this activity. It can only be concluded that MSS Associates engaged in this activity, to the extent there existed any activity, solely for the purpose of claimed tax benefits for its limited partners. We find that in 1981 MSS Associate's computer software activity represented *625 an activity not engaged in for profit. As we have mentioned previously in this opinion, petitioners' entitlements to the losses and investment tax credit attributable to their purchased interests in MSS Associates initially rest on their establishing that MSS Associates' leasing and marketing of the System represented a activity engaged in for profit. Because petitioners have not met their initial showing, B.D. Morgan is not entitled to the 1981 investment tax credit it claimed with respect to the software. Flowers v. Commissioner,80 T.C. at 931; Pike v. Commissioner,78 T.C. at 841-842. As an aside, we also note that in the case Ronnen v. Commissioner,90 T.C. 74 (1988), we have held that computer software is not tangible personal property or other personal property eligible for the investment tax credit. The third issue we address is whether Mr. and Mrs. Morgan failed to file timely their purported 1981 Federal income tax return and are, therefore, liable for an addition to tax pursuant to section 6651(a)(1). Section 6651(a)(1) imposes an addition to tax, not exceeding 25 percent in the aggregate, for the failure to file timely *626 a return unless the failure to file timely is due to reasonable cause and not due to willful neglect. Section 6072(a) requires that income tax returns based on a calendar year must be filed on or before the 15th day of April following the close of the calendar year, unless the 15th day falls on a Saturday, Sunday, or legal holiday; in which event, section 7503 and section 1.6072-1(d), Income Tax Regs., extend the filing date to the next business day. Under section 6081, respondent is authorized to grant reasonable extensions to file on application by the taxpayer. Sec. 1.6081-1(a), Income Tax Regs. The taxpayer bears the burden of proving that the addition is not warranted. Foy v. Commissioner,84 T.C. 50, 75 (1985); Abramo v. Commissioner,78 T.C. 154, 163 (1982); Rule 142(a). Respondent determined that the Morgans' purported 1981 return was filed late. The copy of the document received into evidence reflected a "received" date of May 24, 1982. The envelope in which the document was mailed had a postmark date of May 22, 1982. Mr. Morgan testified that he had timely mailed the document. He did not suggest that the failure of the document *627 to be filed timely was due to reasonable cause. In Walden v. Commissioner,90 T.C. 947 (1988), we held that for purposes of the statute of limitations on the assessment of tax, a taxpayer assumes the risk of nondelivery; accordingly, the failure of the U.S. Postal Service to deliver a return constitutes the failure of the taxpayer to file his return. If the taxpayer must assume the risk of nondelivery, then, a fortiori, the taxpayer must assume the risk of late delivery. Notwithstanding Mr. Morgan's testimony, we, therefore, sustain respondent's determination regarding section 6651(a)(1)'s applicability.[12]
*628 The fourth issue is whether petitioner B.D. Morgan is liable for an addition to tax under section 6659 for a valuation overstatement. An addition to tax is imposed under section 6659 if an individual or a closely held corporation or a personal service corporation has an underpayment of income tax which is attributable to a valuation overstatement. The addition to tax pursuant to section 6659 is determined by applying the applicable percentage to the underpayment attributable to the valuation overstatement. The addition to tax for valuation overstatements under section 6659 applies to individual partners when the overstatement is made on the partnership return. Rev. Rul. 82-37, 1982-1 C.B. 214. The applicable percentage utilized in determining the addition to tax, when the valuation claimed is more than 250 percent of the correct value of the asset, is 30 percent. Therefore, if we determine that the Medical Specialists System was valued by MSS Associates at 250 percent or more of its correct valuation, B.D. Morgan is liable for an addition to tax under section 6659 in the amount of 30 percent of the underpayment of tax attributable to that overvaluation. Because respondent *629 made his determination in the notice of deficiency, B.D. Morgan bears the burden of proving that this addition to tax is not applicable. Rule 142(a); Rybak v. Commissioner,91 T.C. 524, 566 (1988). Both parties presented testimony and reports going to the 1981 value of the System. In valuing the Software at $ 8,000,000, petitioners relied most heavily on the supposed $ 8,000,000 price FSF was to pay Software Tech for the System under the two corporations December 30, 1981, agreement and on the report of Victor Andre. In his report, Mr. Andre suggested that, through aggressive marketing to the medical, dental, and veterinary markets, unit sales and revenue tied to the System could approach the following amounts: Year
Units
Revenue
1986
600
$ 570,000  1987
3,000
2,850,000
1988
10,000
7,500,000
1989
10,000
6,000,000
During this time span from 1986 to 1989, Mr. Andre estimated that the System would also generate a total "net support income" of $ 2,670,000. Respondent's valuing of the System was based on the testimony and expert report of Drs. Vanecek and Guynes. In these doctors' report, the two estimated that the Software's *630 1981 fair market value did not exceed $ 40,000. This estimate was based on their determination that a commercial software development corporation having expertise in the development of this kind of product would charge approximately $ 35,000 to $ 45,000 to develop from scratch a program of similar or superior competitive quality to that of the System. The developed program would be market ready and include source code, executable code, system documentation, and supporting product documentation. The developed program's purchaser would also have unrestricted ownership of the entire product, including source code and documentation. The tremendous gap in estimated values of the System is ominous. We have examined and weighed the reports, testimony, and expertise of both petitioners' and respondent's valuation witnesses, and we have previously concluded that the System's supposed $ 8,000,000 transfer price from Software Tech to FSF did not represent an arm's-length price. Furthermore, though Mr. Andre estimated that the System had a large revenue generating potential in years 1986 through 1989, his estimate was based on the Software's being marketed aggressively. MSS Associate's *631 actions in marketing the Software prior to 1986 do not suggest that the partnership would take the steps necessary to ensure the Software's aggressive marketing. Finally, Mr. Andre's curriculum vitae which accompanied his report lists no information from which we could conclude that Mr. Andre possessed any expertise in the area of computer software marketing and sales generation. Simply put, we find Mr. Andre lacked expertise and that his report and testimony were not competent. Based on the above, we are not swayed by petitioners' evidence and find that the Software's 1981 value was substantially less than the claimed $ 8,000,000. Finding that we cannot rely on petitioners' valuation of the Software, we additionally note that petitioners have not presented us with any evidence which lead us to question substantially the 1981 value placed on the Software by respondent's preeminent experts. We consequently embrace the valuation report of Drs. Veneck and Guynes and sustain respondent's determination concerning B.D. Morgan's liability for payment of an addition to tax under section 6659. [13]
*632 We next consider respondent's determination that petitioners must pay additions to tax under sections 6653(a)(1) and (2). Section 6653(a) provides for additions to tax if any part of the underpayment is due to negligence or an intentional disregard of rules or regulations. If this section applies, then its additions to tax are calculated on the basis of the entire underpayment of tax. Marcello v. Commissioner,43 T.C. 168, 182 (1964), affd. in part and remanded in part 380 F.2d 499 (5th Cir. 1967). Respondent's determination of additions to tax due to negligence or intentional disregard of rules and regulations is presumptively correct, and petitioners bear the burden of proving that these additions have been imposed in error. Enoch v. Commissioner,57 T.C. 781, 802 (1972). In purchasing from Mr. Morrow the partnership interests in MSS Associates on behalf of B.D. Morgan and himself, Mr. Morgan stated that he relied most heavily on his own experience with computers and the advice of a local certified public accountant. Mr. Morgan turned to the accountant to seek this individual's opinion that the purchases of partnership interests *633 in MSS Associates "met the rules," "met the law." Mr. Morgan has not shown that he had any expertise or experience in the marketing of computer software in 1981. Moreover, his investigation of MSS Associates appears cursory and directed toward the tax benefits surrounding his purchase of partnership interests. Being a successful businessman in the field of construction, we would expect Mr. Morgan to be driven by a profitable bottom line. However, when Mr. Morgan listed those information sources on which he primarily relied in purchasing the interests in MSS Associates, no where does he mention that he looked to a report or study tied to the System's marketability and its capability to generate future revenues. The only action taken by petitioners with regard to their investment in MSS Associates was to claim losses related to their partnership interests and to claim an investment tax credit related to the Software leased by the limited partnership. Petitioners have failed to introduce any evidence to carry their burden of proof. We sustain the additions to tax under section 6653(a). We finally turn to the issue of whether petitioners must pay additional interest on an underpayment *634 attributable to a tax motivated transaction as defined in section 6621(c). Section 6621(c) applies to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date on which section 6621(c) was enacted. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). The section provides for an increased rate of interest for substantial underpayments attributable to a tax motivated transactions. A substantial underpayment is defined as an underpayment which is attributable to one or more tax motivated transactions and is in excess of $ 1,000. Sec. 6621(c)(2). Section 6621(c)(3)(A) generally prescribes the types of transactions which are considered "tax motivated transactions." Section 6621(c)(3)(B) authorizes the Secretary by regulation to specify additional types of transactions which will be treated as tax motivated transactions. Section 301.6621-2T, Q and A-4, Temp. Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984), states that any deductions disallowed for any period under section 183 are considered to be attributable to *635 a tax motivated transaction. Section 301.6621-2T, Q and A-10, of the same regulation states that the increased interest rate under section 6621(c) applies to interest accruing on a deficiency after December 31, 1984, attributable to tax motivated transactions including those described in A-4 of the regulation. We have found that petitioners were partners in a partnership whose sole computer software activity represented an activity not engaged in for profit as that phrase is defined in section 183. The underpayments in tax by petitioners which are attributable to this software activity also exceed $ 1,000 in both dockets before us. Consequently, section 6621(c)'s applicability is mandated. [14]
In conclusion, we would be remiss not to state what we find the transaction which is before us to be. Again, simply put, we have before us an abusive tax shelter of the most egregious *636 sort. [15] We are dismayed that a transaction so patently lacking in substance should be the subject of an action before us. Our resources in handing this specious stratagem of tax illusion have been diverted from other cases of merit only to provide an extension of the day of reckoning for these petitioners. Petitioners' arguments border on the meritless and frivolous and invite an award of damages to the United States under section 6673. See Horn v. Commissioner,90 T.C. 908 (1988). We offer this as a cautionary note to these, and like petitioners, that we shall entertain awarding of damages, either sua sponte or on motion of the Commissioner, in future, analogous cases. To reflect the foregoing, Decisions will be entered for respondent.
Footnotes
1. These cases were consolidated for trial, briefing, and opinion on January 23, 1986.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, and Rule references are to the Rules of Practice and Procedure of this Court.↩
3. Sec. 6621(d) was redesignated as sec. 6621(c) by the Tax Reform Act of 1986, 100 Stat. 2744. See Pub. L. 99-514, sec. 1511(c)(1)(A)-(C).↩
4. MSS Associates reported no receipts or sales in the taxable years 1981, 1983, or 1984. The partnership reported gross receipts or sales for the taxable year 1982 in the amount of $ 540. ↩
5. First Savings Financial, Inc. prepared all the offering memoranda, contracts and due diligence files for MSS Associates' sale of partnership interests. For more facts concerning First Savings Financial, Inc., see infra.↩
6. In 1981, the prime rate charged by banks equalled 18.87 percent. U.S. Bureau of the Census, Statistical Abstract of the United States: 1988 (108th edition), Table No. 803, p.484, Washington, D.C. 1987.↩
7. In 1981, there were at least 30 competitive computer software programs being marketed in the United States for the medical profession. Moreover, computer software programs written for various specialists such as optometrists and orthodonists could be adapted to compete with the Medical Specialists System.↩
8. Mr. Andre estimated that it would take about two months to finish the System's programming, about two months to test the System in physician's offices and to write the help routines that the software needed, and about one month to prepare the System's final packaging for market. This packaging included the compiling of a user manual and the choosing of an appropriate box and sales literature.↩
9. We recognize that in Rose v. Commissioner,88 T.C. 386 (1987), a case involving a "generic tax shelter," we adopted an objective test of economic substance rather than a subjective test of profit motive. This case was tried and briefed by the parties prior to Rose, in terms of the presence, or absence, of a profit objective under the factors set forth in section 1.183-2(b), Income Tax Regs. We shall therefore base our analysis on those factors. See Baigent v. Commissioner,T.C. Memo. 1987-314, n. 14. We also note that in Rose v. Commissioner, supra, we set out the following characteristics as indicative of the lack of profit motive/economic substance in cases involving generic tax shelters: (1) the tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. As stated in Rose, in cases having these characteristics, tax motivation is apparent. 88 T.C. at 412↩. The question then to be addressed is whether a sufficient business purpose existed for the taxpayer to obtain the claimed tax benefits.
10. Mr. Morrow stated that prior to adding omitted terms to the blank lease agreement, he and Mr. Klein had discussed the items' inclusions. Petitioners did not, however, present Mr. Klein as a witness. The conspicuous absence of Mr. Klein from the witness stand and a failure on petitioners' part to explain his absence weigh heavily against petitioners. As we said in Pollack v. Commissioner,47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968), "The burden of proof [is] upon petitioners and we cannot assume that the testimony of a critical absentee witness would have been favorable * * *. Indeed, the normal inference is that it would have been unfavorable." See also Tokarski v. Commissioner,87 T.C. 74, 77 (1986); Bresler v. Commissioner,65 T.C. 182, 188 (1975); Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513↩ (10th Cir. 1947).
11. Mr. Morrow testified that prior to hiring Victor Andre to convert the System to the micro-soft disk operating system, he had asked each of two individuals, Grant Stephenson and Dan Conerau, to convert the System. According to Mr. Morrow, neither of these individuals satisfactorily completed the conversion. Petitioners have not, however, presented these two individuals as witnesses so that either could testify as to their efforts and to the persistence of Mr. Morrow in handling the System's conversion. See footnote 9, supra.↩
12. Because we have decided that the Morgans bear the burden of their return's late delivery, we find that the notice of deficiency tied to the couple's 1981 tax return was mailed within the requisite statutory time period. Sec. 6501(a). We note that sec. 6065 provides that a return must be verified by a written declaration that it is made under the penalties of perjury. If the jurat on a return is excised by a line crossing through it, then the document as submitted by the taxpayer does not constitute a valid return. See Cupp v. Commissioner,65 T.C. 68, 78-79 (1975), affd. without opinion 559 F.2d 1207↩ (3d Cir. 1977). In the instant case, we find that the Morgan's purported 1981 return is not a properly filed and valid return within the meaning of section 6065 and that the debate over whether this document was filed in April or May of 1982 is, in fact, pointless. Consequently, and in spite of respondent's failure to argue this point, we alternatively sustain respondent's section 6651(a)(1) determination on these grounds.
13. In valuing the System, we placed little weight on the cash amount Software Tech received, prior to the trial date, from FSF relative to the Software. We first note that this cash amount represented a transfer of funds between two companies physically located at the same address and dealing with each other in a less than arm's-length manner. More importantly, we point out that, prior to the trial date, the original seller of the System, MCS, had received for the computer software which its president developed only $ 27,000 in cash.↩
14. Sec. 6621(c)(3)(A)(i) provides that the term "tax motivated transaction" includes any valuation overstatement within the meaning of sec. 6659(c). We have above found that the System was "overvalued" as that term is defined in sec. 6659(c). Therefore, sec. 6621(c) equally applies on this ground.↩
15. See Snyder v. Commissioner,T.C. Memo. 1985-9↩.